News Service v. Printing Co.

No. 21,633.

THE INTERNATIONAL NEWS SERVICE, *Appellant*, v. THE GA-
ZETTE PRINTING COMPANY, *Appellee*.

SYLLABUS BY THE COURT.

NEWSPAPER PRINTING ESTABLISHMENT—*Sale of "Assets"—Newspaper
Franchise Included in Sale*. The property of a printing establishment
was repeatedly mortgaged and repeatedly sold under contracts which
named certain assets, and also included—

"any and all other articles of any kind formerly connected with the
Gazette Printing Company, . . . also the circulation, good will,
. . . all assets of every kind and nature, it being the intention to
mortgage the entire Gazette Printing Plant and everything connected
therewith, and appertaining thereto, whether mentioned herein or not."

One of the assets was a newspaper, and the successive mortgagors
and vendors surrendered the newspaper along with all the other prop-
erty to successive purchasers, as part of the property mortgaged and
sold. *Held*, that the language of the contracts for mortgaging the
property and for selling it, and the operative interpretation placed
thereon by the mortgagors and vendors justify a finding and judg-
ment that the newspaper franchise was included in the assets pledged
to the mortgagees and included in the property acquired by the
vendees.

Appeal from Reno district court; FRANK F. PRIGG, judge.
Opinion filed July 6, 1918. Affirmed.

*F. Dumont Smith*, of Hutchinson, and *Ray H. Tinder*, of
Wichita, for the appellant.

*C. M. Williams*, and *D. C. Martindell*, both of Hutchinson,
for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff brought this action against the
defendant to recover the value of certain news services fur-
nished to defendant's business predecessor, the Midwest Print-
ing Company.

The case was tried on the pleadings and upon agreed facts.
It appears that some years ago there was a corporation of the
same name as the defendant, the Gazette Printing Company,
which conducted a printing establishment and owned and pub-
lished a daily and a weekly newspaper in Hutchinson, respec-

tively known as "The Daily Gazette," and "The Weekly Ga-
zette." In 1912 that corporation mortgaged all its assets to
one Bruce Dodson for $10,000. Dodson sold this mortgage to
Emerson Carey. Afterwards, in 1914, the corporation sold
all its property, subject to Carey's mortgage, to J. R. O'Con-
nor. For the purpose of renewing the mortgage to Carey,
O'Connor mortgaged the property to one E. Rayl, who as-
signed his interest to Carey. Afterwards O'Connor organized
the Midwest Printing Company, a corporation, and trans-
ferred all the property to it, subject to Carey's mortgage.
Then the Midwest Printing Company gave a second mortgage
on all its property to Rayl. The original corporation, the
Gazette Printing Company, was dissolved; and the Midwest
Printing Company conducted the business and published the
newspaper until about May, 1916, when Carey and Rayl took
possession of the property under their mortgages. They con-
ducted the business and continued to publish the newspaper
for some weeks, and eventually caused a sale of the property
to satisfy their mortgages. As mortgagees they bought the
property at public sale and operated it and conducted the
newspaper, and caused the organization of a new corporation,
the defendant, "The Gazette Printing Company," and sold and
transferred all the property to the latter corporation.

The plaintiff's bill for news service furnished while the
property and newspaper were owned and conducted by the
Midwest Printing Company, some $1,499.75, not being paid,
this action is sought to be maintained against the defendant on
the theory that it has possessed itself of certain intangible
assets of the Midwest Printing Company which were not cov-
ered by Carey and Rayl's mortgages, and that defendant is
liable to plaintiff as the business successor of the Midwest
company.

The trial court gave judgment for defendant, and the plain-
tiff appeals.

The court has no difficulty in recognizing that apart from
the physical and tangible assets of a newspaper establishment
there is a more or less valuable intangible asset consisting of
the so-called newspaper franchise, which is the right to print
the newspaper itself, the right to publish a paper of a certain
name and reputation, the right to enjoy the privileges attend-

ant upon the successful and regular publication of the newspaper for some considerable length of time.

Plaintiff contends that this intangible property was not covered by the various sales, chattel mortgages and foreclosures through which the defendant has become possessed of the newspaper which received the news services furnished by plaintiff. But the fact is governed by the terms of the contracts of mortgage and sale, and by the conduct of the successive mortgagors and vendors. In the chattel mortgage given by O'Connor, who owned the newspaper and the other assets in 1914, the property subjected to the payment of the debt was thus described:

"All printing presses, linotype machines, type, fixtures, type cases, and in fact all material and fixtures, tools, machines, equipment, furniture, and any and all other articles of any kind formerly connected with the Gazette Printing Company, now J. R. O'Connor, also the circulation, good will, accounts, bills receivable all assets of every kind and nature, it being the intention to mortgage the entire Gazette Printing Plant and everything connected therewith, and appertaining thereto, whether mentioned herein or not."

To give language its usual and fair significance, it seems clear that the newspaper franchise, the right to run the newspaper theretofore published by the mortgagor, was included in that mortgage contract. Whatever personal property may be the subject of barter and sale may be the subject of a chattel mortgage, which is merely a sale defeasible. And so long as the intangible assets pertaining to physical property are not severed and are not attempted to be mortgaged or pledged independently of the tangible assets, the nice question as to whether there can be such a severance and independent hypothecation of such intangible assets needs no attention. Here the defeasible sale, the chattel mortgage, pledged all the assets of every kind and nature—the intangible as well as the tangible assets were included—and to make assurance doubly sure it was recited that it was "the intention to mortgage the entire Gazette Printing Plant and everything connected therewith, and appertaining thereto, whether mentioned herein or not." But whether the intangible assets could be the subject of a chattel mortgage under our recording act or not, they could be pledged; they could be assigned, and they were assigned. (*Hall v. Terra Cotta Co.,* 97 Kan. 103, 154 Pac. 210.) All the

assets were pledged; the circulation was pledged; the good will was pledged; everything pertaining to the printing plant, whether mentioned or not, was pledged; and this certainly included the newspaper which pertained to and was connected therewith. We would not say dogmatically that the newspaper franchise was covered alone by the words "good will," but it was covered by the text and spirit of the entire contract. The same broad language was used in the contracts of sale of the property. Moreover, under such language of hypothecation and such language of sale, as the property passed from hand to hand, the operative interpretation placed on this language has been that it included all the intangible assets. Former owners successively parted with the newspaper as a pertinent part of the property on that interpretation of their own contracts.

The language of the contracts of mortgage and sale, and the operative interpretation placed thereon by successive mortgagors and successive vendors, fully justified the finding and judgment of the trial court that the defendant lawfully acquired and lawfully holds the property free from any demand or claim of the plaintiff.

The judgment is affirmed.