No. 22,574.

## H. J. POWELL and STANLEY PLATZ, *Appellees*, v. A. J. VALENTINE, *Appellant*.

### SYLLABUS BY THE COURT.

1. TRADE NAME—*Name of Newspaper—Infringement—Injunction*   The owner of a newspaper who suspended its publication and merged it with that of another publisher, but who continued to maintain an office for the transaction of the unfinished business of the suspended paper and for the care of the business which he had built up in connection with his newspaper, and who continued to transact such business in its name, may enjoin a subsequent, rival publisher from using the name of the suspended newspaper, or a name so nearly similar to it as to be likely to confuse or mislead the patrons of the first publication, or to divert to the subsequent publisher the business patronage which the first publisher had built up through the successful publication of his newspaper in that locality for a considerable time.

2. SAME—*Injunction Not Premature.* Where actual damage through unfair trade practices is imminent or highly probable, the injured party is not ordinarily required to wait until he has actually suffered such damage. He may seek, at once, to forestall and prevent such damage by the aid of a court of equity.

3. SAME—*Facts Show Infringement on Trade Name of Newspaper.* One of the plaintiffs for several years owned and published in Coffeyville a newspaper commonly known as the "Sun," although its formal title was "The Coffeyville, Kan. Sun." He formed a partnership with another Coffeyville publisher who owned a paper called the "Journal." The partners merged their papers, continued the publication of the "Journal," and suspended the publication of the "Sun"; but its former proprietor continued to maintain an office for the transaction of its accruing and continuing business. Soon after the merger, a third publisher, who had theretofore published a free paper in Coffeyville, called "The Earth," began the publication of a new paper formally entitled, "The Morning Sun and the Daily Earth," but which, by the style and the arrangement of its caption would be read and named as "The Sun" and would probably mislead the public and unfairly divert the business which had been built up in and about Coffeyville in connection with the earlier publication of that name. *Held*, that the use of the word "Sun" by the third publisher as a name or part of a name for his newspaper was an unfair trade practice and was properly enjoined.

4. SAME—*Petition for Injunction—Verification.* A temporary restraining order ought not to issue on a petition which is not positively verified; but when, later, it is properly verified and the restraining order has given place to a temporary injunction lawfully issued, no re-

versible error can be predicated on the improvident issue of the restraining order.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed April 10, 1920. Affirmed.

*Thomas J. Hanlon,* and *Walter S. Keith,* both of Coffeyville, for the appellant.

*Charles D. Welch,* and *Dallas W. Knapp,* both of Coffeyville, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This action was for an injunction to restrain unfair trade practices.

The plaintiffs, who for some years past had respectively conducted morning and evening newspapers in Coffeyville, the "Sun" and the "Journal," formed a partnership in January, 1919, consolidated their newspapers, suspended the publication of the "Sun," and thereafter continued to serve the readers of both papers by the publication of the "Journal." The plaintiff Platz, who had been the individual owner of the "Sun" before the merger, continued to maintain a business office for the "Sun," carried a bank account under its name, received and issued checks in the name of the "Sun," and attended to the business of the suspended publication.

On February 2, 1919, the defendant, who theretofore had been publishing a paper in Coffeyville for free distribution, called the "Earth," commenced the publication of a new morning paper in Coffeyville, called the "Sun." The plaintiffs at once protested against the use of the name "Sun," and as their protest was disregarded, this action was begun. A restraining order was issued, and upon a full hearing some days later the district court granted a temporary injunction,

"That the defendant, A. J. Valentine, be and he hereby is restrained and enjoined from employing in his business conducted at Coffeyville, Kansas, the name of 'The Sun,' or 'The Morning Sun,' or any name employing the word 'Sun,' and these things he is restrained and enjoined from doing, either directly or indirectly."

Defendant appeals, urging that the demurrer to plaintiffs' evidence should have been sustained. The plaintiffs' evidence tended to support the allegations of their petition. It is meas-

Powell v. Valentine.

urably true that the full name of the earlier paper was "The Coffeyville, Kan. Sun," and that the defendant's paper was technically labelled "The Morning Sun and the Daily Earth," but the evidence was sufficient to show that the ordinary trade name of the earlier paper was the "Sun." The caption of the paper was printed in bold type about an inch in height, "The Sun," the words being separated by an ornamental vignette showing the rays of a rising sun, and in the center the congested district of a thriving town, with the words "Coffeyville, Kan." in small, neat type encircling the bottom. The words of the device may have served the purpose of being part of the paper's formal title, but it more precisely served the purpose of indicating that the pleasing picture in the vignette was intended to portray Coffeyville. While it is also true that the full title of the defendant's paper was "The Morning Sun and the Daily Earth," yet the prominent words were "The Sun." The word "Morning" was discernible only by a close scrutiny of a vignette roughly similar but not nearly so elaborate as that of the old paper's device. The words "and the Daily Earth" were printed beneath the main caption in common brevier or bourgeois type. Only by careful reading would it be noticed that these words were formally intended to be part of the paper's name. It is a matter of common knowledge that where a newspaper has a long name it is seldom known by that name. The public, and the owners also, invariably abridge it. For all practical purposes, each paper in this case must be considered to have borne the name of the "Sun." After the merger of the Sun and the Journal, the proprietor of the suspended paper continued to receive and pay out money in the name of the "Sun," and conducted an office for the transaction of its unfinished and continuing business. If the new paper infringed that business or interfered with it in any substantial degree, such infringement or interference amounted to unfair trade practice. (*Nesne v. Sundet,* 93 Minn. 299; 106 Am. St. Rep. 439.) And the ascertainment of that fact was the function of the trial court, not the function of this court. Here both the evidence and the circumstances tended to show that the launching of the new paper was opportunely made upon the merger of the older paper with the "Journal," That was justifiable enterprise on the part of the defendant,

but he should have chosen another name for his paper. The plaintiffs did not intend to abandon the trade name of the older "Sun"; it was valuable to them in many ways; and they did not need to wait until their business had suffered before invoking equitable relief against the defendant. It was enough to show that the use of the old paper's name, or one so nearly similar as to be readily confused therewith, would probably mislead the public and divert a substantial amount of the legitimate patronage which the plaintiffs had built up through satisfactory service to their customers in connection with the original "Sun" publication. (*Harryman v. Harryman,* 93 Kan. 223, 228, 144 Pac. 262; 38 Cyc. 756, *et seq.*)

In *News Service v. Printing Co.,* 103 Kan. 402, 173 Pac. 980, it was said:

"The court has no difficulty in recognizing that apart from the physical and tangible assets of a newspaper establishment there is a more or less valuable intangible asset consisting of the so-called newspaper franchise, which is the right to print the newspaper itself, the right to publish a paper of a certain name and reputation, the right to enjoy the privileges attendant upon the successful and regular publication of the newspaper for some considerable length of time." (p. 403.)

Counsel for appellant concede that it is the duty of a subsequent trader, coming into an established trade, not to dress up his goods or market them in such a way as to cause confusion between his goods or business and that of a prior trader. This court has little hesitancy in saying that the facts and circumstances justified the trial court in holding that the defendant violated that rule. Nor are we unmindful that the salutatory of the new paper, among other ingratiating remarks and civilities, announced that it was not the successor of the earlier paper nor connected with it. Of course it was not the successor of the earlier paper, but it had appropriated its name; and it was highly probable, if this unfair trade practice had been persisted in by the defendant and not enjoined by the trial court, that a substantial amount of the business built up by the plaintiff would unfairly be diverted to the new publication.

Among the cases relied on by appellant is that of *The Kansas Milling Company v. The Kansas Flour Mills Company,* 89 Kan. 855, 133 Pac. 542. Its analogy to the case at bar is not strong. Part of the corporate name, "The Kansas . . . Company," was not exclusively that of the older corporation.

Powell v. Valentine.

Perhaps a hundred Kansas corporations lawfully use these words in their corporate titles. The other words of their respective titles, "Milling," and "Flour Mills," are about as different as they could well be and still comply with the provision of law that the corporate title shall be indicative of the corporate business. (Gen. Stat. 1915, § 2105.) In that case the chiefly significant words were different; in this case the chiefly significant words, "The Sun," are identical.

In Nims on Unfair Competition (2d ed.), section 279, it is said:

"Most of the litigation involving title to newspaper names arises because of the fact that the full name of a paper is seldom used in speaking of it. 'The New York Evening Post' and 'The Saturday Evening Post' are referred to merely as 'The Post.' In London and New York 'The Times' is well known, yet the person using the term in one city does not mean what is commonly meant by the same name in the other city. The 'London Times' could not restrain the publishing of a 'Newcastle Times' or a 'Bristol Times' in those towns. Yet it could doubtless restrain a rival from setting up, at London, a competing paper as 'The London Morning Times.' For instance, to start 'The Grocer' when the 'American Grocer' was being published and was commonly known as 'The Grocer' was held unfair.

"The rules which apply to such cases are very similar to those applied to others spoken of in connection with trade names; and the use of such names will be forbidden or regulated where deception or the likelihood of fraud is shown.

.　.　.　.　.　.　.　.　.　.　.　.　.　.

"Newspapers and other periodicals possess individuality and have peculiar traits which are of value to them just as persons have individuality. Each has a name which may be a fanciful one devised especially for it or it may be a combination of common words of the language. In either case, it is of prime and essential importance to the paper that its identity be not lost, that it be not confused with any other paper. The 'New York Sun' strives for and posseses a real individuality. A paper has principles, it has a creed, it has a history, a past good or bad, which it must live up to or live down. In the one case it is important to its owners that it shall not lose its identity and in the other it is of importance to the community that it be known for itself and be prevented from masking under the name of a more respectable neighbor.

.　.　.　.　.　.　.　.　.　.　.　.　.　.

"The locality in which a paper or magazine is circulated is an important element in determining the rights of the parties to the name of it. Two papers may have identical names and no loss results, if they do not reach the same territory and are not read in the same communities." (pp. 535-540.)

(See, also, Note, 5 Am. St. Rep. 113, 114, and 38 Cyc. 773, *et seq.*)

A minor point urged by appellant is that the plaintiffs' petition was not positively verified when the temporary restraining order was issued. It was defective in that respect, and the temporary restraining order should not have issued thereon. However, that matter is immaterial now. As soon as the defect was pointed out it was corrected by positive verification, and the temporary injunction which binds the appellant now is based upon positively sworn evidence both oral and written, together with the evidence inherent in the circumstances. (*Hartzler v. City of Goodland*, 97 Kan. 129, 132, 154 Pac. 265.)

The record discloses no error, and the judgment is affirmed.